Filed 11/24/20  P. v. Heredia-Patron CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE RAUL HEREDIA-PATRON,<br><br>    Defendant and Appellant. | G057645<br><br>(Super. Ct. No. 16WF2120)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed as modified.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven E. Mercer and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

A jury acquitted Jose Raul Heredia-Patron of attempted premeditated murder, but convicted him of torture (Pen. Code,[1] § 206; count 2), assault with a deadly weapon (§ 245, subd. (a)(1); count 3), and second degree robbery (§§ 211, 212.5, subd. (c); count 4). The jury also found true both a personal use of a deadly weapon (knife) penalty enhancement related to counts 2 and 4 and found a great bodily injury enhancement related to counts 3 and 4. (§§ 12022, subd. (b)(1); 12022.7, subd. (a).) In a bifurcated proceeding, defendant admitted three prior serious felony convictions (§ 667, subd. (a)(1)); he also admitted that three prior serious or violent felony convictions brought him within the Three Strikes law (§§ 667, subds. (b)-(j); 1170.12, subds. (a)-(d)), and the fact that he had served two prior prison terms (§ 667.5, subd. (b)). The trial court sentenced Heredia-Patron to an aggregate term of 85 years to life, consisting of consecutive base terms of 25 years to life on counts 2 and 4, plus 35 years in determinate sentencing for the enhancements on those counts.

On appeal, defendant contends section 654 permits punishment for either his robbery or torture conviction, but not both. He also challenges sentencing fines and assessments totaling—apart from the probation report fee—just under $400, on grounds he has no ability to pay them. Respondent acknowledges the court did not determine whether defendant would be able to pay the probation report fee within a year, as required by statute. Apart from that fee, which we modify (§ 1260) the judgment to delete, we affirm the judgment in all other respects.

---

[1] All further statutory references are to this code.

## FACTUAL AND PROCEDURAL BACKGROUND

Brenda Eddy was about to use the fax machine in the leasing office where she worked in her family owned office building when defendant suddenly appeared behind her desk inches away from her. She had not heard him enter the office or approach her. A rental payment she had been processing, consisting of ten $100 bills, was on her desk along with her car keys. Eddy asked defendant to move to the other side of the desk, away from her, but he refused and told her he was there to "rob" her.

Eddy screamed, hoping to attract attention from tenants in the building. Defendant told her to "shut up, shut up" and stabbed her multiple times in her abdomen. He held onto Eddy's right arm as she struggled against him. As she tried to reach for pepper spray in her desk drawer, Heredia-Patron released her, seized her car keys and the cash, and exited the office. Eddy could hear that Heredia-Patron was outside in the parking lot using the key fob on her key ring apparently trying to locate her car, "beeping and beeping it."

Heredia-Patron then reentered the leasing office. Eddy was moving toward the doorway when defendant confronted her about five feet from that exit. She testified that defendant "just started yelling at me where's my car, where's my car and started stabbing towards me; so he got my hand here and he got my hand through here and out here (indicating)." Defendant also stabbed her in the leg several times.

Eddy testified that as defendant was stabbing her and "all of that was going on," "[h]e wanted to know where my car was, just yelling at me 'Where's your car? Where's your car' . . . . [¶] And I just told him that 'It's right'—'It's right there. It's right there.' My car was three spots over." Defendant and Eddy kept "going back and forth 'Where's your car' and [her] responding 'It's right there'" about three or four times before defendant exited again.

Eddy stood in the middle of the driveway as defendant reached her car, about 20 feet away from her. As she screamed and people came out of the building,

3

defendant opened the door of Eddy's car. He then threw her keys to the ground and said, "'You want them, bitch? Here, take them.'" Defendant then fled on foot; officers from the Westminster Police Department later apprehended him on the 405 freeway.

Eddy spent several nights in the hospital recovering from 14 stab wounds. One of seven wounds to her abdomen lacerated her liver, which required her admission to the critical care unit. Surgeons reconnected the nerves in her right hand and index finger, but she still lacked feeling in one finger at the time of trial. The stab wounds, including three to her fingers and four to her leg, continued to cause Eddy pain after she was released from the hospital.

As relevant at sentencing, the trial court in denying defendant's request for a stay under section 654 concluded that defendant "maintained separate objectives." The court observed that when defendant "could not locate her vehicle" after stabbing Eddy in the abdomen to rob her of $1,000 and her car keys, "he returned to the victim's location in the leasing office and stabbed her again and again and again, demanding that she tell him where her car was located. [¶] That was the torture." The court observed the prosecutor had identified the torture count "as occurring when the defendant returned the second time, and that is consistent with the facts."

The court also indicated its belief that, while the robbery and torture "occurred at a relatively close proximity in time to each other," the defendant "reflected and returned to the victim's location." The court then concluded, "These were separate crimes and distinct crimes. The facts do not suggest that this was a continuous course of conduct."

## DISCUSSION

1. *Section 654*

Defendant contends that, pursuant to section 654, he cannot lawfully be punished for both robbing (count 4) and torturing his victim (count 2). "We review the

4

trial court's [section 654] determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).)

Section 654 provides that "[a]n act or omission" punishable by different penal statutes may be punished only under the one providing "for the longest potential term of imprisonment," not both.  The law's purpose is "to insure that a defendant's punishment will be commensurate with his culpability." (*People v. Perez* (1979) 23 Cal.3d 545, 552 (*Perez*).)  The restriction applies not only to a single act violating multiple code provisions, but also to an indivisible "course of conduct" violating several statutes.  (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207-1209.)  Whether a course of conduct is divisible for purposes of section 654 depends on the intent and objective of the defendant.  (*Ibid.*)  Generally, if multiple offenses "'were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'" (*People v. Correa* (2012) 54 Cal.4th 331, 336.)

Bald claims of a single, all-encompassing intent do not automatically trigger application of section 654.  A generalized intent to derive sexual gratification, for example, "does not prohibit the imposition of multiple punishment for separate sexual offenses committed during a continuous attack, 'even where closely connected in time.'" (*People v. Hicks* (1993) 6 Cal.4th 784, 788, fn. 4.)  A defendant committing "a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act." (*Perez*, *supra*, 23 Cal.3d at p. 553.)

If the defendant harbors and acts upon "'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, '*even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.*'" (*People v. Harrison* (1989) 48 Cal.3d 321, 335, italics added; see, e.g.,

*People v. Trotter* (1992) 7 Cal.App.4th 363, 368 (*Trotter*); *People v. Nubla* (1999) 74 Cal.App.4th 719, 730-731.)

In *Trotter*, a single minute separated two gunshots fired at a pursuing police officer. The court found consecutive punishment for each shot was proper. The court noted that the defendant's conduct "became more egregious with each successive shot. Each shot posed a separate and distinct risk to [the victim] and nearby freeway drivers. To find section 654 applicable to these facts would violate the very purpose for the statute's existence." (*Trotter*, *supra*, 7 Cal.App.4th at p. 368.) As *Trotter* observed, "[T]his was not a case where only one volitional act gave rise to multiple offenses. Each shot required a separate trigger pull. All three assaults were volitional and calculated, and were separated by periods of time during which reflection was possible. None was spontaneous or uncontrollable." (*Ibid.*) Stated another way, "'multiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm.'" (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717 (*Lopez*).)

Here, defendant bases his argument on the general principle that robbery is a continuing offense that is not complete until the perpetrator reaches a place of temporary safety. (*People v. Harris* (1994) 9 Cal.4th 407, 421.) Separate takings during an ongoing robbery are considered part of the same robbery. (See *ibid.*) Similarly, defendant is correct in asserting that multiple physical acts can be component parts of a single robbery. (See *People v. Corpening* (2016) 2 Cal.5th 307, 315.)

Defendant relies on these principles to conclude that his multiple assaults on Eddy—first to obtain her cash and car keys, and then to learn the location of her car— were one indivisible course of conduct requiring a stay under section 654. According to defendant, the only reasonable conclusion is that *both* instances in which he used force against Eddy were aimed at a singular criminal objective: taking her car. Because his first and second assaults on Eddy were connected by this common purpose, he contends

6

the robbery necessarily included his second attack on Eddy as part of the overall "actus reus" of the robbery count. He then reasons that because the second attack was the basis for his torture conviction, the robbery and torture offenses shared the same "actus reus" or, alternatively, the acts underlying the two offenses formed an indivisible course of conduct that precluded punishment for both.

We disagree with this analysis given the facts before us. "Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination." (*Jones*, *supra*, 103 Cal.App.4th at p. 1143.) "[T]he question of whether the acts of which a defendant has been convicted constituted an indivisible course of conduct is primarily a factual determination, made by the trial court, on the basis of its findings concerning the defendant's intent and objective in committing the acts. [Citations.] This determination will not be reversed on appeal unless unsupported by the evidence presented at trial." (*People v. Ferguson* (1969) 1 Cal.App.3d 68, 74.)

The evidence supports the trial court's section 654 ruling. "[G]ratuitous violence against a helpless and unresisting victim . . . has traditionally been viewed as *not* 'incidental' to robbery for purposes of Penal Code section 654." (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 190-191, italics added.) Such wanton violence is an escalation above the use of force or fear to commit a robbery (§ 211). The court could reasonably find the second assault involved an independent criminal objective that was not just an extension of his effort to steal Eddy's vehicle. Specifically, the court found that defendant's stabbing thrusts at Eddy's arms and legs immediately upon reentering the office manifested a new and different criminal intent: to torture her.

Torture involves cruelty for cruelty's sake: inflicting "cruel or extreme pain and suffering . . . for any sadistic purpose." (§ 206.) Simply put, violently stabbing Eddy at this point was a gratuitous act committed by Heredia-Patron after he demanded to know where her car was and she told him. The court reasonably found that something

7

had changed between the first assault and the second one. It may have been that defendant wanted to retaliate for Eddy's resistance to his initial attack, or that he was unable to resist a sadistic impulse to stab at her. But either way, the court could reasonably find that the violence in the second attack was unnecessary, and therefore was not in furtherance of an overriding robbery objective. He had her keys and she immediately told him where her car was when he asked. Therefore, the evidence supports the conclusion that defendant harbored a new, independent objective at that point: to cruelly inflict unnecessary pain and suffering on Eddy.

The gap in time between the attacks independently supports the court's ruling. "Under section 654, a course of conduct divisible in time, *though directed to one objective*, may give rise to multiple convictions and multiple punishment 'where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.'" (*Lopez, supra*, 198 Cal.App.4th at pp. 717-718, italics added.) Consequently, even assuming arguendo that defendant's sole objective in both attacks was to secure possession of Eddy's vehicle, he did not abandon his larcenous efforts after robbing Eddy of $1,000 and escaping outside. Instead, he escalated matters. He formulated and acted upon a new intent to torture Eddy through multiple additional stab wounds, thereby increasing his culpability. A "defendant should . . . not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his . . . assaultive behavior." (*People v. Harrison, supra,* 48 Cal.3d at p. 338.) The trial court reasonably found section 654 did not apply to preclude punishment for both robbery and torture.

2. *Costs, Fines, and Fees*

Defendant challenges the trial court's sentencing decision requiring him to bear the unspecified cost of his probation report (§ 1203.1b, subd. (b)(2)), and to pay a $10 theft fine (§ 1202.5, subd. (a)), criminal and court operations assessment fees of,

8

respectively, $30 and $40 (Gov. Code, § 70373, subd. (a)(1); § 1465.8, subd. (a)(1)), and a $300 minimum restitution fine (§ 1202.4, subd (b)(1)). These amounts are in addition to $1,395 in direct victim restitution that the court ordered defendant to pay.

Respondent concedes, and we agree, that the probation report fee must be stricken. The applicable statute requires not only that the trial court determine the defendant has the ability to pay the cost of the probation report, but also that, "[i]n no event shall the court consider a period of more than one year from the date of the hearing for the purposes of determining [the defendant's] reasonably discernible future financial position" to pay the fee. (§ 1203.1b, subds. (a), (e)(2).) Thus, the "trial court is limited to one year for the purpose of determining the defendant's future financial position" to pay probation report costs. (*People v. Hoover* (2011) 199 Cal.App.4th 1470, 1473-1474.)

The court properly took into account the fact that defendant has the ability to earn wages while in prison. (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076 (*Aviles*).) Nevertheless, any sums he earns are earmarked first to pay direct victim restitution. (*People v. Rodriguez* (2019) 34 Cal.App.5th 641, 649.) By defendant's calculation, which respondent does not dispute, it will take years of prison wages—potentially even a decade—before he pays his $1,395 restitution obligation to the victim. As such, his financial position in the year following sentencing does not reflect an ability to pay the probation report fee. Therefore, it must be stricken. (*Id.* at pp. 649-650.)

The remainder of the fines and fees that defendant challenges—totaling just under $400—do not involve a deadline. As the trial court observed, with an ability to earn prison wages, "He will be employed for 85 years to life." The court acknowledged, "I know it's not much of an income," but with the opportunity to earn wages to pay his debt to society, the court concluded it "would not be inclined" to grant defendant's request to strike the fees for lack of an ability to pay.

The trial court did not err. Defendant was 56 years old at the time of sentencing. Nothing in the record suggests he will be unable to work in prison, where he

9

can earn between $12 and $56 per month, depending on his skill level. (*Aviles*, *supra*, 39 Cal.App.5th at p. 1076.) Even assuming that it takes him, at the minimum prison wage, about 10 years or more to pay his direct victim restitution that would not preclude him from paying the remainder of his fines and fee obligations thereafter.

Defendant's reliance on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 is misplaced. He asserts his $70 in assessments and the $300 restitution fine in particular "must be stayed until the state proves [he] has the ability to pay" it. But the record supports the court's conclusion that working in prison furnishes him the means to do so. There is no merit to the constitutional gloss defendant puts on his claims. Because he can pay the remainder of his fines and fees—apart from the probation report fee within the time allotted—the trial court did not violate the narrow proportionality requirement of the due process clause of the federal Constitution's Fifth and Fourteenth Amendments, nor the Eighth Amendment's prohibition against excessive fines.

## DISPOSITION

The judgment is modified (§ 1260) to strike the probation report fee. In all other respects, the judgment is affirmed.


GOETHALS, J.

WE CONCUR:


FYBEL, ACTING P. J.


IKOLA, J.

10